IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RONALD DEMARCO          )
                        )
        Plaintiff,      )
                        )    No. 12 cv 2059
    v.                  )
                        )    Magistrate Judge Arlander Keys
MICHAEL J. ASTRUE,      )
Commissioner of         )
Social Security         )
                        )
        Defendant.      )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Robert DeMarco (plaintiff or "Mr. DeMarco") has
filed a motion for summary judgment [19] seeking judicial review
of the final decision of the Commissioner for Social Security
("Commissioner"). The parties consented to the jurisdiction of
this Court pursuant to 28 U.S.C. § 636(c). For the reasons set
forth below, Mr. DeMarco's motion for summary judgment is
denied. The Social Security Administration's January 4, 2012,
decision is affirmed.

I.   **PROCEDURAL HISTORY**[1]

Plaintiff, Ronald DeMarco, initially applied for Social
Security Disability Benefits on July 10, 2000. Record at 106-
08. In his application, he alleged that he became disabled on
December 5, 1997 due to constant back pain following a

---

[1] As the Bates numbers on the administrative record in this case are not
consistent, the record cites in this opinion refer to the PageID # listed on
the top right of each page of the record.

laminectomy, as well as arthritis in his hands. R. 106. The Social Security Administration ("SSA") denied his claim on October 5, 2000, finding that he still possessed the ability to perform light work. R. 80. Mr. DeMarco entered a protective filing to secure his application date with the SSA on July 29, 2002, he then entered a second application for disability benefits on November 27, 2002. R. 114-17. Mr. DeMarco's application was denied initially on February 5, 2003, and upon reconsideration on March 13, 2003. R. 84, 91. On March 25, 2003, Mr. DeMarco filed a written request for a hearing. R. 95.

Administrative Law Judge ("ALJ") John L. Mondi held the hearing on August 19, 2004. R. 67-69. The ALJ issued his opinion denying benefits on October 25, 2004. R. 70-76. On November 2, 2004, Mr. DeMarco requested that the Appeals Council review the ALJ's decision. R. 55. The Appeals Council denied Mr. DeMarco's request for review on November 15, 2005. R. 45. Mr. Demarco appealed the decision to the District Court.

The District Court remanded the matter to the SSA. R. 426. The Appeals Council remanded the case to an ALJ on April 4, 2008 for rehearing. R. 405. ALJ Mondi held a hearing on October 7, 2008. R. 445. On November 4, 2008, ALJ Mondi issued a decision denying benefits to Mr. DeMarco. R. 389. Mr. DeMarco appealed the decision to the District Court for a second time. The

District Court again remanded the case to the SSA on March 17, 2011.  R. 503.

The Appeals Council once more remanded the case to an ALJ on June 6, 2011.  R. 569.  ALJ John Kraybill held a hearing on September 21, 2011.  R. 614.  On January 4, 2012, the ALJ issued a decision denying benefits to Mr. Demarco.  R. 486.  On March 13, 2012, Mr. DeMarco appealed the decision to the District Court.  R. 2.  The parties consented to vest jurisdiction in a Magistrate Judge, and it was transferred to this Court on August 14, 2012.  R. 675.  The case is currently before the Court on Mr. DeMarco's motion for summary judgment, in which, Mr. DeMarco seeks the Court to award him benefits, or in the alternative, remand the case for further consideration.  R. 755-64.

## II.   FACTUAL BACKGROUND

Mr. DeMarco's date of birth is August 4, 1952.  R. 58.  He was employed as a diesel mechanic for Global Van Lines in the 1970's.  R. 367.  Mr. DeMarco was also employed as a truck driver and automobile mechanic for Pell's Express between June of 1979 and April 1, 1996.  R. 342, 366.  He initially hurt his back while working for Pell's Express in December 1994.  R. 343.  On December 5, 1997, Mr. DeMarco underwent a decompressive lumbar laminectomy and microlumbar discectomy. R. 80.  Mr. DeMarco testified that he began a small engine repair business in 1996, which he ran until 2002.  R. 340-41.  He also plowed

3

snow in the winter of 2001-2002.  R. 339.  Mr. DeMarco's date
last insured was September 30, 2002.  R. 8.

## III. MEDICAL EVIDENCE

### A.    Dr. Boury

Dr. Boury, Mr. DeMarco's neurological surgeon, noted that
Mr. DeMarco first injured his back while attempting to lift the
rear door of a trailer while working for Pell's Express in
December 1994.  R. 242.  Mr. DeMarco's physical therapist noted
back pain on December 28, 1994.  R. 199.  Dr. Boury noted that,
on January 4, 1995, Mr. DeMarco had been experiencing radiating
left buttock and posterior thigh pain which went almost halfway
down the calf. R. 242.  In the MRI report dated February 6,
1995, a radiologist diagnosed degeneration of the L5-S1 disc
with moderate bulging at L5-S1.  R. 200.  On August 28, 1995,
Dr. Boury noted that Mr. DeMarco was still experiencing sharp
pain in his right buttock, through the thigh, down to the calf.
R. 240.  Dr. Boury also noted that Mr. DeMarco was experiencing
toothache-like symptoms in both calves, primarily on the right
side, and that these symptoms occured more readily when he is
seated. *Id*.

On September 7, 1995, Dr. Boury found that Mr. DeMarco was
"entitled to have symptoms of back pain" which can get worse
when he "sits down for any length of time." R. 239.  On
November 17, 1997, a radiologist found L4-5 disc herniation on

4

the left as well as L5-S1 subligamentous bulging on a lumbar MRI. R. 201. During this visit, Dr. Boury noted that Mr. DeMarco was experiencing severe back pain, as well as pain radiating down his buttock bilaterally. R. 210. Dr. Boury also noted that straight leg raising was "markedly limited at right over left" and Mr. DeMarco had a "very antalgic gait," while also noting severe back pain which was improved by bed rest. R. 238. Dr. Boury also had the impression that Mr. DeMarco had lumbar radiculopathy during this visit. R. 230.

On December 2, 1997, before undergoing back surgery, Dr. Boury informed Mr. DeMarco about the possibility of disc herniation recurrence being "about 15%." R. 222. Dr. Boury also noted that this was a concern considering Mr. DeMarco's job repairing small engines at the time. *Id.* Dr. Boury performed the operation on December 5, 1997. It consisted of a decompressive lumbar laminectomy of L4 and L5 bilateral, microlumbar discectomy at the level of L4-L5, on the right side, exploration of the L5-S1 disk space which found a herniated disc at the level of L5-S1 on the left and a microlumbar discectomy at the level of L5-S1 on the left. R. 205.

Mr. DeMarco had his first postoperative follow up visit on December 15, 1997. R. 236. Dr. Boury noted that he was doing extremely well and was taking one painkiller a day. *Id*. On January 26, 1998, Dr. Boury noted that Mr. DeMarco was

5

progressing, but had some stiffness in the morning "that one would expect following the surgery." R. 235.  On June 29, 1998, Mr. DeMarco was overall very pleased with the resolution of his bilateral buttock pain.  R. 234.  At the time, Mr. DeMarco was complaining of localized back pain, which was remedied by Tylenol with codeine.  *Id.*

On January 21, 1998, Mr. DeMarco was admitted to the Central DuPage Hospital emergency room.  R. 218.  Mr. DeMarco was experiencing nausea and tingling to both hands which resolved itself prior to arrival.  *Id.*

**B.    Disability Determination Services**

On September 1, 2000, Dr. Velis, a physician for the Bureau of Disability Determination Services ("DDS"), noted that Mr. DeMarco was in moderate distress during his medical examination.  R. 248.  Mr. DeMarco was 5 feet, 8 inches, tall and weighed 218 pounds at the time of the examination.  R. 247.  Dr. Velis also noted that Mr. DeMarco had a limited range of motion and a positive straight leg raise test with marked paravertebral muscle tenderness and spasms with occasional radicular symptoms radiating to the gluteal region.  R. 248.  A radiologist with the DDS indicated that Mr. DeMarco had "minimal degenerative changes with occasional osteophytes at the vertebral endplates," and slight sclerosis in the lower lumbar spine along with

6

laminectomy at L4 and L5 with minimal narrowing at the L4-L5 and L5-S1 intervertebral spaces. R. 251.

### C. Functional Capacity Assessments

A Residual Functional Capacity ("RFC") Assessment was conducted on September 26, 2000. R. 252. The assessor found that Mr. DeMarco was capable of occasionally lifting 20 pounds, and frequently lifting 10 pounds. R. 253. Mr. DeMarco was also found to be incapable of climbing a ladder, rope or scaffold. R. 254.

A second RFC Assessment, conducted two and a half years later, on March 13, 2003, held different results. R. 269. The second assessor found that Mr. DeMarco was capable of occasionally lifting 50 pounds and frequently lifting 25 pounds. R. 270. The assessor also noted that Mr. DeMarco's ability to sit was limited, he was required to periodically alternate between sitting and standing to relieve pain or discomfort resultant of his surgery. *Id*. Mr. DeMarco was limited to occasionally stooping, crouching and crawling. R. 271. The assessor also noted that Mr. DeMarco was responding to his medication. R. 274.

### D. Dr. Blas

Mr. DeMarco initially sought treatment with Dr. Blas, a pain physician, on March 25, 2002. This was the first medical treatment that Mr. DeMarco had sought for his back since being

treated by Dr. Boury.  R. 267-68.  Dr. Blas noted that Mr.
DeMarco's back pain was only controllable by consuming oral
medication between March 25, 2002 and January 6, 2003.  R. 260-
268.  Dr. Blas prescribed
Mr. DeMarco Percocet from April 4, 2002 to June 26, 2002.  R.
263-67.  He found that Mr. DeMarco was experiencing low back
pain, which was controlled by either M.S. Contin or Oxycontin
from December 12, 2002 to June 11, 2004.  R. 260-68, 271-97,
303-321.  On December 12, 2002, Dr. Blas indicated that Mr.
DeMarco's pain was controlled using M.S. Contin.  R. 284.
However, on March 24, 2003, Mr. DeMarco reported to Dr. Blas
that he was suffering from a great deal of pain.  R. 282.

On August 27, 2003, Dr. Blas drafted a narrative report on
Mr. DeMarco's medical condition.  R. 278.  Dr. Blas indicated
that Mr. DeMarco's pain was not being controlled by either Soma
Compound or Vicodin.  *Id*.  He also noted that Mr. DeMarco had
pain in the lower back and his straight leg raising test showed
pain, moderate to severe at 30 degrees extension when both lower
extremities were extended.  *Id*.  Dr. Blas diagnosed Mr. DeMarco
with radiculitis, chronic and irritative L4-L5, L5,S1 bilateral
secondary to epidural adhesions and Postlaminectomy Syndrome,
lumbar.  R. 278.  Dr. Blas stated that he was seeing Mr. DeMarco
every other month.  *Id*.

On December 4, 2003, Dr. Blas noted that Mr. DeMarco was able to do chores and was learning to tolerate his pain. R. 307. Dr. Blas's appointment notes develop a steady progression of increasingly frequent and worsening pain. R. 260-68, 271-97, 303-321. Dr. Blas was operating off of a diagnosis of radiculitis and post-laminectomy syndrome. *Id*.

At the time of the 2004 ALJ hearing, Dr. Blas had prescribed Mr. DeMarco 20mg Oxycontin twice a day for pain, Celebrex every day for arthritis, Valium at night for sleep as a muscle relaxant, Soma Compound 2 to 3 times a day for spasms and Naproxen 3 times a day as needed for elbow pain. R. 187.

Evidence entered at the 2011 ALJ hearing included Dr. Blas's prescriptions for 10mg Valium twice per day, Vicodin as needed up to twice per day, 20mg Oxycontin as needed if Vicodin does not work and Soma three times per day and at bedtime. R. 607-10.

**E.    Dr. Choi**

The record contains notes from Dr. Choi, the physician that treated Mr. DeMarco's right elbow. R. 299. On April 21, 2004, Dr. Choi noted that Mr. DeMarco was in no duress during his visit. *Id*. Dr. Choi found that Mr. DeMarco's range of motion in the right hand and the wrist was normal and he had full range of motion in his right shoulder. *Id*. However, "neurovascular examination distally demonstrate[d] some mild grip weakness

9

compared to his nondominant left side." R. 299-300. Dr. Choi noted degenerative change with joint space narrowing and ostephyte formation on Mr. DeMarco's elbow. R. 300-01. Dr. Choi's impression was that Mr. DeMarco had osteoarthritis in his right elbow as well as median nerve neuropathy. R. 300.

Additional notes from Dr. Choi were provided for the 2008 ALJ hearing. R. 439-444. On May 11, 2005, Dr. Choi's impression was that Mr. DeMarco was suffering from osteoarthritis in the right elbow as well as ulnar neuropathy. R. 441. On September 12, 2007, Dr. Choi's impression was that Mr. DeMarco was suffering from osteoarthritis with limited motion in the right elbow with probable ulnar neuritis at the elbow. R. 439.

## IV. PREVIOUS HEARINGS

### A. 2004 Hearing With ALJ Mondi, Ruling and Appeal

#### 1. Testimony of Ronald DeMarco

The 2004 hearing occurred before ALJ Mondi. Mr. DeMarco appeared, represented by counsel, and a vocational expert was also present at the hearing. R. 332. Mr. DeMarco testified that he was 52 years old at the time of the hearing. R. 338. He was married with one 16 year old child living at home. *Id*. He has a ninth grade education and he took the GED examination, but had no record of passing it. R. 339. He received a degree in automotive from Greer Technical Institute. R. 366.

His work history consisted of being a truck driver and automobile mechanic for Pell's Express from June of 1979 through April 1, 1996.  R. 342, 366.  He was also a diesel mechanic for Global Van Lines in the 1970's.  R. 367.  Mr. DeMarco was also self-employed performing small engine repair from 1996 until 2001 or 2002; he plowed snow one winter in either 2001 or 2002. R. 339-41.  He began repairing engines before his back operation, however, after the operation, he was unable to continue with the work due to pain.  *Id*.

Mr. DeMarco initially hurt his back while working for Pell's Express in December of 1994.  R. 343.  Following his injury, he was diagnosed with bulging disks and was relegated to light duty while working for Pell's Express until his termination on April 1, 1996.  R. 343-44.  Following his termination he was unable to find work due to his back problems. R. 345.  While he was self-employed repairing engines, he would start his work day at 9:00 AM and by noon, he would begin feeling pain, which would require him to take his medication. R. 359.  Mr. DeMarco stated that he would force himself through the pain many times to finish repairing the engines.  *Id*.  He would finish around 6:30PM or 7:00PM.  *Id*.  After returning home from work, he was unable to stand up after sitting down and would be forced to crawl up the stairs.  *Id*.  He worked like this five to six days a week.  *Id*.

Mr. DeMarco was prescribed Vicodin at the time of this hearing and it was "just taking the edge off" of the pain.  R. 345.  Mr. DeMarco testified that he underwent disc laminectomy for three disks.  *Id*.  After the surgery, he underwent physical therapy and took medication as continuing treatment.  *Id*.  He still experienced pain in his back at the time of the hearing.  R. 346.  He stated that he experienced pain going down either the right or the left leg at the time of the hearing.  R. 361.  He also alleged that he was unable to walk two blocks at the time of the hearing.  R. 348.  He said he may be able to walk a block, however, after walking a block, he experiences painful back spasms.  R. 364.

Mr. DeMarco did not believe he could walk for two hours out of an eight hour day continuously or not.  R. 368.  He testified that his ability to stand at the time of the hearing was dependent on the medication he was taking at the time, his ability to sit for periods of time is likewise determined by the medication he is taking.  *Id*.  He did not believe he could sit for an eight hour day if he were allowed to stand periodically.  *Id.*  He also stated that he did not believe he would be able to stand for two hours of an eight hour day on a consistent basis.  *Id*.

Mr. DeMarco alleged pain in his left elbow in conjunction with his back pain.  R. 346.  At the hearing, Mr. DeMarco was

12

unable to extend his left arm to make it parallel with a table that he had placed it on. *Id*. He stated that he was right handed and had lost a substantial amount of strength in his right hand. *Id*. He alleged that he experiences a shooting pain through the elbow in his right arm and drops things with his right hand. R. 346-47. He alleged that he is unable to reach with his right arm "[b]ecause it doesn't go up." R. 360. Mr. DeMarco testified that he had also been diagnosed with depression. R. 348.

At the time of the 2004 hearing, Mr. DeMarco was taking Oxycontin, Celebrex, Valium, Soma Compound and Naproxen. R. 349. Mr. DeMarco testified that he was experiencing side effects from his medication. R. 350. He stated that he was addicted to Oxycontin at the time of the hearing, and that it caused him blurred vision, affected his concentration and required him to sit down after taking it. *Id*. While under the effects of Oxycontin, he feels as if he is drunk, he is unable to drive and would be unable to operate machinery. R. 358. Oxycontin's effect on his concentration is the reason he stopped his small engine repair company. *Id*. He testified that his intake of Oxycontin was not exceeding the amount prescribed by his physician. R. 355-56.

Mr. DeMarco testified that his medications make him sleep, specifically the Oxycontin, and Valium when taken in conjunction

with Oxycontin. R. 362. The day before the hearing, he had slept for 18 hours. R. 363. He testified that Dr. Blas had also prescribed him Vicodin and Valium in the past. *Id*. At the time of the hearing, he was taking Oxycontin on a daily basis and was taking Valium as needed for pain when the Soma Compound was not sufficient. R. 362. He was taking Valium 3 to 4 times a week or more. *Id*. He also stated that his medications were affecting his memory. R. 363. Sometimes he would have problems finishing tasks or even realizing that he was doing a task. *Id*.

Mr. DeMarco testified that he has problems taking care of himself and performing tasks around the home. R. 352. He testified that he has had this problem since his back operation on December 5, 1997. *Id*. He is unable to tie his shoes while wearing them. R. 360. He was having problems bending his torso at the time of the hearing, and could not bend at the waist. *Id*. He was able to drive a car, cut his grass with a riding mower, however, his son had to do the trimming in the yard, because he was unable to hold a weed whacker without dropping it. R. 352-53. Mr. DeMarco testified that for exercise, he was able to do stretches in the morning, but was unable to walk distances, though he is able to walk around his house. R. 353.

In regards to pain, Mr. DeMarco testified that at the time of the trial he was at an 8.5 on a 0 to 10 scale of pain, where 10 is the worst pain. R. 354. He said that his pain level

14

never drops below a 7 on this scale. *Id.* To alleviate pain during the day, he lays on his couch at an angle, because sitting straight induces pain. R. 360. Sitting causes pain inducing spasms, which are less painful when using medication. R. 364. Sleep and Valium also help alleviate the pain. R. 360-61. He naps for 2 to 3 hours a day. R. 363.

Mr. DeMarco testified that Dr. Boury informed him that he had scar tissue built up in his spine, which the doctor wished to remove with a RACZ procedure. R. 357. Mr. DeMarco did not wish to undergo this procedure, because he did not want to be "opened up again," and subjected to a "full blown operation," or the recovery. R. 356-57. He also testified that one of his doctors had informed him that he had arthritis throughout his back. R. 364.

### 2. Testimony of Vocational Expert

Mr. James Breen, a vocational expert who had reviewed Mr. DeMarco's file and heard his testimony before the ALJ, also provided testimony at the 2004 hearing. R. 365-88. Mr. Breen determined that a hypothetical person with limitations similar to Mr. DeMarco's would be able to return to all of his past relevant work based on the RFC Assessment taken on March 3, 2003. R. 372. He stated that, if a hypothetical person with these limitations was required to take more than 10 minutes per hour to stretch, or if they had a 10 pound lifting limitation,

they would be unable to perform any of Mr. DeMarco's previous truck driving jobs.  R. 379, 384.  He stated that, if the person was unable to fully extend their right arm, so as to shift gears, they would also be unable to perform any of Mr. DeMarco's previous truck driving jobs.  R. 384.

Mr. Breen testified that, if the person were required to stand for more than 10 minutes an hour, or were limited to lifting no more than 10 pounds, they would be unable to perform small engine repair.  R. 381, 84.  If the person were unable to maintain concentration throughout an 8 hour day, they would be unable to perform any job.  R. 381.  Based on the RFC assessment taken on September 26, 2000, a hypothetical person with limitations similar to those outlined in the assessment would not be able to return to any of Mr. DeMarco's past relevant work.  R. 374.

Mr. Breen stated that there was a wide range of unskilled occupations which a person with limitations based on the 2000 RFC Assessment could perform in the light work group category. R. 374.  The jobs available to a person with those limitations would not change if that person had a right arm impairment which limited extending the arm and restricted lifting with the arm to no more than 10 pounds.  R. 375.  He stated that if a person had all of the limitations which Mr. DeMarco alleged to have in his testimony, they would be unemployable.  R. 376.  Mr. Breen

16

testified that, if the only limitation alleged by Mr. DeMarco to be placed upon the hypothetical person was his inability to bend, that it would preclude the hypothetical person from truck driving, small engine repair and one of the three hypothetical jobs indicated by Mr. Breen in his analysis.  R. 386-87.  If the person had limitations on periodic standing and sitting or concentration it would interfere with many of the positions which he had indicated were available for a hypothetical person with Mr. DeMarco's limitations.  R. 381-83.

### 3.  2004 Decision and Appeal

On October 25, 2004, ALJ Mondi issued an unfavorable decision.  R. 67-76.  ALJ Mondi found that Mr. DeMarco did not have an impairment that met or medically equaled a listed impairment.  R. 75.  ALJ Mondi also found that Mr. DeMarco's allegations regarding his symptoms were not credible in establishing disabling limitations, especially his work activities.  R. 75.  In addition, ALJ Mondi found that Mr. DeMarco was unable to perform any past relevant work.  *Id*.  The Appeals Council denied Mr. DeMarco's Request for Review.  R. 5.

Mr. DeMarco then appealed his case to the District Court. R. 419-26.  On August 16, 2007, the District Court reversed the ALJ's decision and remanded the matter to the Social Security Administration for further proceedings.  R. 426.  The Court found that the ALJ had not indicated the basis for rejecting Mr.

DeMarco's explanations, and therefore, the path of his reasoning for the rejection could not be traced. *Id.* The Court found that, though there may be enough evidence in the record to support the ALJ's rejection of Mr. DeMarco's alleged limitations, the ALJ was required to explain whether Mr. DeMarco's allegations could or could not be accepted as consistent with evidence. *Id.* The Court held that these errors made it necessary for the ALJ to reassess Mr. DeMarco's credibility and RFC. *Id.*

**B.    2008 Hearing with ALJ Mondi, Ruling and Appeal**

On remand, a supplemental hearing was held before ALJ Mondi on October 7, 2008. R. 392. Mr. DeMarco was represented by his attorney, Barry A. Schultz, at the hearing. R. 447. Also present for the hearing was Thomas Gusloff, a vocational expert. *Id.* Mr. Schultz gave a brief opening statement at the hearing. R. 449. He claimed that Mr. DeMarco did not undergo the RACZ procedure, because he was not only afraid of being subjected to another operation, but he would also have to pay for the procedure out of pocket. *Id.* He also brought attention to Dr. Blas's diagnoses of radiculitis, as well as post-laminectomy syndrome. R. 450. Mr. Schultz pointed out that Mr. DeMarco's positive straight leg raising tests resulted in pain in the extremities. *Id.* Mr. Schultz made the argument that, because Mr. DeMarco had turned 50 years old by his date last insured,

Mr. DeMarco should be found disabled under the rule if he were limited to sedentary work.  R. 451.

### 1.    Testimony of Ronald DeMarco

At the 2008 hearing, Mr. DeMarco testified that he was now divorced.  R. 451.  He clarified that he had attempted to plow snow in 2003, but was unable to do it because it aggravated his back. R. 452.  He said that he was only able to plow snow two or three times.  R. 453.  He had to keep pulling over and getting out of the truck, because the pain kept getting worse, and he was unable to take any medication to control it because he was driving.  *Id*.

Mr. DeMarco testified that the reason he had closed his small-engine repair company, was because he was unable to stand and work on things.  R. 453.  He testified that, as the pain would grow worse, he would take more medication, and it made him fall behind in his repairs.  *Id*.  Mr. DeMarco testified that his business ran three years at a loss without generating any profits.  R. 454.

Dr. Blas told Mr. Demarco that recovery from the RACZ procedure would take about six months.  R. 458.  Dr. Blas told him that the operation does not work on some people and that the risks were basically the same as his first back surgery.  *Id*.  Mr. DeMarco did not have health insurance at the time that Dr. Blas recommended the procedure.  *Id*.

19

Mr. DeMarco said the medications which were most successful in alleviating his pain were the ones he was prescribed at the time of the hearing, Oxycontin, Valium and Soma Compound.  R. 459.  Mr. DeMarco stated that, when he was on M.S. Contin, he would have to take it with the Valium and Soma Compound in combination to have an effect on his pain, this occurred up to four times per week.  R. 459-60.  He testified that when taking that combination of drugs, it would make him a "zombie" by robbing him of his thought process and concentration and making him want to sleep.  R. 459.  Mr. DeMarco said that, when taking Oxycontin, he had similar side effects, causing him to want to lie down and making him feel like a "zombie."  R. 461.

Mr. DeMarco testified that his pain in 2001-2002 was easily aggravated by sitting, it would cause his back to tighten up before getting progressively worse and spasming.  R. 462.  He said sitting in his jacuzzi tub would help alleviate the pain. R. 463.  He said exercise, work hardening and physical therapy made his pain worse and did not help alleviate his pain.  *Id*. He said that in 2001-2002, he was unable to stand for longer than 10 minutes without experiencing shooting pains going down his legs.  *Id*.  On the day of the hearing, he had not taken his pain medication, because he is unable to drive under the effects of the medication.  R. 464.

Mr. DeMarco lived alone during the 2001-2002 timeframe and doing chores aggravated his back pain. R. 464-66. Activities which aggravated his pain included tying his shoes, doing dishes and doing laundry. R. 465. An hour or two after doing these activities, Mr. DeMarco would experience pain down his legs, back spasms and general pain. *Id.* He was also having trouble bending, and if he dropped something, he would have to either sit down or get down on his knees to pick it up. *Id.*

### 2. Testimony of Vocational Expert

Mr. Gusloff, a vocational expert, testified at the 2008 hearing that Mr. DeMarco's self-employment in small engine repair or his position plowing snow would not count as past relevant work, because there was no evidence in the record to demonstrate that he had participated in those roles at a substantially gainful activity level. R. 471. Mr. Gusloff said that a hypothetical person under the limitations which were assessed against Mr. DeMarco in his first ALJ hearing would be able to find employment, including that as a delivery truck driver and other jobs related to truck driving. R. 472.

A person with the same limitations, but who was limited to light work would not be able to perform any of Mr. DeMarco's previous jobs, as they were all at the medium level, however there were other positions where Mr. DeMarco's experience as a mechanic would allow him to be employable. R. 473. Mr.

DeMarco's attorney objected to this testimony, because there had been no transferable skills found in the past and transferable skills were not remanded for reconsideration.  R. 473.

Mr. Gusloff said a person with a right elbow impairment that precluded sustained repetitive manipulation with the right arm, who was limited to less than frequent use of the arm, would be limited to light or sedentary work.  R. 474-75.  Mr. Gusloff testified that a person with all of the limitations alleged by Mr. DeMarco, especially in regards to the effects of medication, would not be employable.  R. 475.

Mr. Gusloff testified that a hypothetical person who was required to miss more than one unscheduled hour per week of work, would eventually not be employed.  R. 476-77.  He also testified that, if he would have to take off two hours during the workday, because he had to lie down or could not concentrate, he would not be able to maintain employment.  R. 477.  If a person were required to avoid machinery, jobs related to small engine repair skills would not be possible.  R. 477-78. Some of the positions available to the hypothetical person may not accommodate the alternating sitting and standing limitation which was present in Mr. DeMarco's record.  R. 480.  He also testified that if the person had a limit of standing for at most 10 minutes, they would be placed in a sedentary category.  R. 482.

### 3.   2008 Decision and Appeal

ALJ Mondi issued an unfavorable decision denying benefits on November 4, 2008.  R. 389.  ALJ Mondi found that Mr. DeMarco had not engaged in substantial gainful activity after the alleged onset date of his disability.  R. 394.  Mr. DeMarco did not have an impairment or combination of impairments that met, or medically equaled, a listed impairment. *Id*.  Mr. DeMarco had the functional capacity to perform medium work "not requiring more than frequent balancing, kneeling or climbing; more than occasional stooping, crouching or crawling; and subject to a need to be able to periodically alternate between sitting and standing to relieve low back pain."  R. 395.  ALJ Mondi found that Mr. DeMarco's statements regarding the intensity, persistence and limiting effects of his symptoms were not credible when compared to the objective evidence.  R. 396

ALJ Mondi found that Mr. DeMarco's ability to conduct small engine repair with his hands for several years through his date last insured, indicated that his current debilitation was not significantly limiting until after his date last insured.  R. 397.  He found Mr. DeMarco's testimony regarding the side effects of his medication to not be credible.  *Id*.  He determined that Mr. DeMarco's alleged side effects were not significant enough to preclude him from repairing small engines for several years, driving a car or cutting his grass with a

riding mower, indicated that they were not so severe as to preclude all work. *Id*. ALJ Mondi adopted the RFC assessment dated March 13, 2003 which indicated that Mr. DeMarco could perform a restricted range of medium work through his date last insured, because it was supported by the record as a whole, as well as Mr. DeMarco's work activities. *Id*.

Mr. DeMarco sought judicial review in the District Court. R. 504-559. On March 17, 2011, the District Court reversed the decision of the ALJ and remanded the matter to the Social Security Administration. R. 558. The Court remanded due to a mischaracterization of Mr. DeMarco's testimony regarding why he closed his small engine repair business, as well as a statement by the vocational expert. R. 550, 553.

### C. 2011 Hearing With ALJ Kraybill, Ruling

ALJ John Kraybill held a third hearing on September 21, 2011. R. 569, 614-68. Mr. DeMarco was represented by his attorney, Barry Schultz; also present were Dr. James McKenna, a medical expert; Edward Pagells, a vocational expert; and Sheryl Bigbee, a hearing monitor. R. 616.

Admitted into evidence at this hearing were statements of FICA income demonstrating that in 1997 and 1998, Mr. DeMarco earned $0.00, and in 1999, $2,958.00. R. 594. The statements also indicate that Mr. DeMarco had earned $0.00 in yearly earnings after 1999, except for a $2,774 profit in 2001. R.

24

118, 597.  Also introduced into evidence was a Blue Cross Blue
Shield policy statement which indicated that, between June 2004
and June 2006, Blue Cross did not provide coverage for the RACZ
procedure which was recommended for Mr. DeMarco.  R. 611-613.
The evidence also included up to date prescriptions of Mr.
DeMarco.  R. 607-10.

### 1.    Testimony of Ronald DeMarco

Mr. DeMarco testified that at the time of the 2011 hearing,
he was living with his ex-wife.  R. 620.  He and his wife were
divorced, though they continued living in the same house.  *Id*.
When asked about his "phobia with hospitals[,]" Mr. DeMarco
stated that he didn't "like hospitals any more than anybody else
does" and that he "never liked or enjoyed being operated on."
R. 622-23.

Mr. DeMarco testified that the main reasons that he was not
able to return to work between 1997 and 2002 was because his
range of motion "went right out the window" after the operation
and his back "just steadily got worse[.]"  R. 623.  The
operation affected his ability to stand, sit and lift things.
*Id*.  He said his back is "always in spasms," but that he gets
some relief during the day when he takes his medication.  R.
623-24.  In regards to his medication, Percocet "didn't do
anything" for him, and Oxycontin worked best for treating the
pain, but it caused him to sleep.  R. 624.

Mr. DeMarco said the reason he did not want to undergo the RACZ procedure was because he could not afford it, as he did not have insurance. R. 625. Mr. DeMarco also indicated that, after his first back operation, he could not appropriately maintain his personal hygiene for a sixth month period due to the pain and other effects of the operation. R. 626.

The pain he experiences after standing or sitting too long begins in his middle to upper back, travels down and through his buttocks to either or both legs and also causes his back to "tighten up into a knot[.]" R. 626. He described the pain as if "someone took a hot poker and stuck it through my [cheek] all the [way] down to my toes and it's just like a burning, aching feeling, hard to describe, sharp pain." R. 626-27. After his surgery, he did experience relief at first. R. 627. In July of 2000, he could sit, stand or walk for 15 minutes at a time, prior to this, he would experience pain that would cause him to lay down or reposition. *Id.* He would regularly lay on the floor to alleviate his pain. *Id.* While working for his engine repair business, he would only be able to work for 15 minutes at a time before he would have to sit or lay down, and he was only able to work for a half hour to an hour and a half every day. R. 629.

Mr. DeMarco stated that he was unable to bend at the waist at the time of the hearing and that his range of motion for

bending had been affected by the surgery.  R. 631.  He said his back pain affected his ability to sleep at night and caused him to wake up stiff and mentally "cloudy" from the medication, the cloudy feeling lasting for roughly an hour after waking up.  R. 632.  He stated that he had trouble with climbing stairs, he needs to use a handrail to climb stairs and can only climb them slowly.  R. 633.

Mr. DeMarco also complained of problems with his right arm in January 2003.  R. 629.  He stated that the problem began years before 2003, but it had grown progressively worse. R. 629-30.

### 2.  Testimony of Medical Expert

Dr. James McKenna, testified at the hearing.  R. 636.  Dr. McKenna was board certified in internal medicine and pulmonary disease and licensed to practice in Illinois at the time of the hearing.  *Id*.  He had never personally examined Mr. DeMarco, and his opinion was based upon a review of Mr. DeMarco's file.  R. 637.  Dr. McKenna said Mr. DeMarco's medical record indicated his back problems began in 1995.  R. 639.

Dr. McKenna stated that Dr. Boury's notes from December 15, 1997 indicate that Mr. DeMarco was "basically doing amazingly well and recovering as one would expect."  R. 643.  He took note of appointments on January 26, 1998 and June 29, 1998, which demonstrate Mr. DeMarco's progress and his return to work in his

garage with occasional complaints of lower back pain which responded to Tylenol with codeine.  R. 643-44.

Dr. McKenna also took note of the four year gap in treatment notes from 1998 to 2002, when Mr. DeMarco began to see Dr. Blas in 2002.  *Id.*  He testified that he cannot explain how Mr. DeMarco went from a successful surgery outcome to his then-present situation based on the record he was presented with.  R. 645.  He did not have "the evidence to show why he deviated from the successful post op course[,]" which he said was "really the real crux of the matter."  *Id.*

Dr. McKenna stated that Mr. DeMarco's situation is one of chronic, unexplained pain.  *Id.*  It is possible that the pain is the result of the operation Mr. DeMarco underwent, however for seven months following the surgery, Mr. DeMarco was still doing well.  *Id.*  He could not give Mr. DeMarco credit for having arachnoiditis, which may explain the symptoms which were occurring in his back, because he did not have the evidence to say that it was a possibility.  R. 646.  Dr. McKenna also testified that the only "rock-solid" evidence of elbow problems came after the date last insured, on April 6, 2004.  *Id.* Dr. McKenna opined that the record indicated the possibility of narcotic dependence.  R. 646-647.

Dr. McKenna also testified that, between December 5, 1997 and September 30, 2002, Mr. DeMarco's impairments, or

combination of impairments, would not meet or equal the listings. R. 647. However, during that time, limitations would be imposed on the RFC. *Id*. The limitations would at least limit him to medium loads, consisting of 20 pounds occasionally and 10 pounds frequently, no use of ladders, ropes or scaffolds. R. 648. Ladders, stairs and ramps shorter than five or six steps limited to occasional use only, due to pain. *Id*. Mr. DeMarco would be able to balance frequently, if not under the constant influence of narcotics, manipulative would be limited to occasionally, and limited to occasional exposure to extreme cold and no lifting 20 pounds at arm's length. R. 648-49.

Dr. McKenna opined that Mr. DeMarco should avoid exposure to vibrating vehicles, equipment or machinery. R. 649. He would, however, be able to stand and walk for eight hours at a time. R. 650. But he would not be able to operate, or be around, moving machinery where one may have to take rapid evasive action. R. 650-651.

Dr. McKenna declared that a positive straight leg test could be an indication of sciatica or radiculopathy. R. 651. Dr. McKenna stated that, if there were "solid evidence" of radiculopathy, he would limit Mr. DeMarco to the sedentary level, and would be limited to standing and walking to six hours and less than 30-33 percent of occasional. R. 652.

Mr. DeMarco's reduced deep tendon reflexes could be indicative of spinal disease. R. 653. Dr. McKenna believed that Dr. Blas diagnosed Mr. DeMarco with radiculitis for insurance reasons. R. 653-654. Dr. McKenna incorporated Mr. DeMarco's chronic pain complaint in determining his RFC limitations, however he did not understand why Mr. DeMarco had pain. *Id*. He explained that post-laminectomy syndrome is unexplained, ongoing, post-operative pain. R. 655-656. He disagreed with statements made by Dr. Velis, the agency doctor, who said there was a medical basis for Mr. DeMarco's pain in his medical report, because there was no clear evidence of pain. R. 656-657.

Dr. McKenna testified that Mr. DeMarco's medication, when taken in conjunction, have an increased effect on Mr. DeMarco. R. 657. Someone using that combination of medication may need to lie down due to their side effects. R. 658. However, chronic use of the medication would lower their sedative effects. *Id*.

Dr. McKenna declared that, if Dr. Blas's range of motion tests were accepted, Mr. DeMarco's stooping ability would not be affected, because he would be able to compensate for his spine by using his hips. R. 660.

30

### 3.  Testimony of Vocational Expert

Mr. Pagella is a vocational expert who had reviewed Mr. DeMarco's records and listened to his testimony before the ALJ. R. 661.  He stated that Mr. DeMarco's skills were industry specific.  R. 662.  However, a person with the limitations Dr. McKenna gave Mr. DeMarco would be able to perform work in a light, unskilled position.  R. 663.  However, a person who had to lie down during the work day, for even an hour, would be unable to sustain employment.  R. 664.  He said that, if a person would have to be off task, including breaks, for more than 15% of the work day, they would not be able to sustain substantial, gainful, activity.  R. 664.

### 4.  Ruling

ALJ Kraybill issued a decision denying benefits on January 4, 2012.  R. 6-18.  The ALJ found that Mr. DeMarco was last insured on September 30, 2002.  R. 8.  He had not engaged in substantial gainful activity between his onset date of December 5, 1997, and September 30, 2002.  *Id*.  The ALJ found that Mr. DeMarco had degenerative disc disease and disc herniation following his L4-L5 and L5-S1 decompression surgery.  *Id*. However, the ALJ found that Mr. DeMarco did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  R. 9. In his decision, the ALJ took note of Dr. Boury's and the State Medical

31

Agency's notes, as well as Mr. DeMarco's four year gap in treatment. *Id*.

The ALJ found that Mr. DeMarco had the RFC to perform light work, except climbing long ladders, ropes and scaffolds. R. 10. He found that Mr. DeMarco could occasionally climb ramps, stairs and short ladders, stoop, kneel and crawl. *Id*. He should avoid lifting 20 pounds at arm's length and avoid exposure to extreme cold and concentrated exposure to vibration. *Id*.

The ALJ found that Mr. DeMarco's "impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the RFC. R. 12. The ALJ found that Mr. DeMarco was not under disability at any time from December 5, 1997, the alleged onset date, through September 30, 2002, the date last insured. R. 18.

## V.    DISCUSSION

### A.    Applicable Law

An individual claiming a need for Disability Insurance Benefits or Social Security Insurance must prove that he has a disability under the terms of the Social Security Administration. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if

the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the plaintiff bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering the facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212

33

(7th Cir. 2003)).  Where conflicting evidence allows reasonable
minds to differ, the responsibility for determining whether a
claimant is disabled falls upon the Commissioner, not the
courts.  *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate
and logical bridge from the evidence to his conclusions, so that
the Court may afford the plaintiff meaningful review of the
SSA's ultimate findings. *Steele*, 290 F.3d at 941.  It is not
enough that the record contains evidence to support the ALJ's
decision; if the ALJ does not rationally articulate the grounds
for that decision, or if the decision is not sufficiently
articulated, so as to prevent meaningful review, the Court must
remand.  *Id*.

**B.   Analysis of Mr. DeMarco's Arguments**

Mr. DeMarco argues that the ALJ's decision should be
remanded, because the ALJ failed to properly evaluate all of the
evidence in light of his counsel's argument and the testimony of
the medical examiner in determining Mr. DeMarco's RFC; and he
failed to properly evaluate the credibility of Mr. DeMarco's
allegations.  Mr. DeMarco also argues that the case should be
remanded to the ALJ with instruction to award benefits to Mr.
DeMarco.

### 1.   The ALJ's Evaluation of the Evidence

Mr. DeMarco argues that the ALJ did not properly evaluate the evidence within the record for two reasons. First, Mr. DeMarco argues that the ALJ did not properly interpret Mr. DeMarco's previous diagnoses of radiculitis, and second, Mr. DeMarco argues that the ALJ misinterpreted the results of the straight leg test based on Dr. McKenna's testimony.

Mr. DeMarco argues that the ALJ erred by not finding that he had radiculitis, and thus should be limited to sedentary work.  Section 405(g) of the Social Security Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence shall be conclusive." 42 U.S.C. § 405(g).  "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  Simply because a plaintiff has been diagnosed with a medical condition does not establish a functional limitation.  *Skinner*, 478 F.3d at 845. An "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not by itself suffice." *Gudgel v. Barnhart*, 278 F.3d 467, 470 (7th Cir. 2003).

Mr. DeMarco argues that he should be limited to a sedentary RFC assessment.  Mr. DeMarco argues that the diagnosis of

radiculitis by Dr. Blas should limit Mr. DeMarco to a sedentary
RFC assessment, because of Dr. McKenna's testimony that, if Dr.
McKenna had "solid evidence that [Mr. DeMarco] had
radiculopathy, [Dr. McKenna] would automatically limit him to
sedentary level[.]"  R. 652.

    The ALJ found that "there was no clinical evidence of
radiculopathy in the record."  R. 16.  This finding was
supported by the testimony of Dr. McKenna.  R. 654-56.  The ALJ
did note that "Dr. Blas continually listed radiculitis (symptom)
as the working diagnosis on his records[.]"  R. 16.  However, a
diagnosis of radiculitis is not what Dr. McKenna testified was
required for an automatic limitation to sedentary work.  He
testified that he would need "solid evidence," which he did not
have based on the record before him.  R. 652, 654-54. Because
the ALJ reasoned that Dr. Blas' diagnosis was not supported by
evidence in the record, including Mr. DeMarco's limitations, the
ALJ was proper in relying upon the opinion of Dr. McKenna in
determining that Mr. DeMarco had a light RFC capacity.  Mr.
Demarco responds that the positive straight leg test is clinical
evidence of radiculopathy that the ALJ did not properly
evaluate.

    Mr. DeMarco argues that the ALJ should not have concluded
that positive straight-leg raising tests, reduced reflexes and
reduced range of motion were not clinical evidence of

radiculitis.  Dr. McKenna testified that a positive straight leg test is:

> A meningeal sign in consult, it's a sign of obstruction of nerve root. And positive straight leg can be due to tight hamstrings, can be due to a variety of situations but it was looked at positive in this kind of setting, it would be a sign of – it could be positive in paravertebral muscle spasm or it can be a sign of stretching of the nerve root with tenderness of that nerve root with tenderness of that nerve root so that never in pain in that setting. So it could [be] and indication of a kind of sciatica or radiculopathy.

R. 651.  Dr. McKenna also testified that reduced deep tendon reflex in the ankle and knee "could be indicative of pathology or it may not have any significance at all[.]"  R. 653.

Mr. DeMarco argues that, pursuant to 20 CFR 404.1528, straight leg-raising tests are considered objective evidence in support of Mr. DeMarco's claim.  The ALJ took note of Dr. McKenna's testimony regarding the multiple potential causes of positive straight-leg testing in his opinion.  R. 15.  Though the test could objectively indicate several maladies, it is not necessarily an objective sign of radiculopathy, as the plaintiff has argued.  As such, the ALJ's determination that the positive straight-leg raising tests were not indicative of radiculopathy was proper.

Mr. DeMarco also argues that the ALJ acted improperly by taking into account Dr. McKenna's testimony regarding Dr. Blas's diagnosis of radiculitis for insurance purposes.  However, the

ALJ did not find that the diagnosis was used strictly for insurance purposes, as suggested by Mr. DeMarco. The ALJ took the testimony of Dr. McKenna into account in making his decision, however he did not reject the diagnosis of Dr. Blas. R. 16. Dr. McKenna's RFC assessment, which the ALJ relied upon in making his RFC determination, took into account Mr. DeMarco's chronic complaints of pain associated with the diagnosis of radiculitis by Dr. Blas. R. 647-50.

The Court finds that the ALJ provides substantial evidence for his findings that Mr. DeMarco could perform a reduced range of light work. The ALJ did not error in interpreting the evidence. He considered the diagnosis of Dr. Blas and the functional limitations Mr. DeMarco would have due to his alleged impairments. He also reasonably relied on the testimony of Dr. McKenna.

### 2. The ALJ's Evaluation of Mr. DeMarco's Credibility

Mr. DeMarco argues that the ALJ relied upon a mistake of fact in making his credibility determination, and that there is not substantial evidence to support the ALJ's credibility determination.

### a. Mistake of Fact

Mr. DeMarco argues that the ALJ relied upon a mistake of fact in reaching his conclusions. When an ALJ's decision, which is based on "matters of fact, is unreliable because of serious

mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion, in which event a remand would be pointless. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996) (citing *O'Connor v. Sullivan*, 938 F.2d 70, 73-74). However, a mistake of fact may be considered harmless "when a contrary determination would have to be set aside as incredible." *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).

Mr. DeMarco argues that the ALJ made a mistake of fact by referencing a treatment note from September 2, 2003, after the date last insured, and misquoting its contents. The ALJ stated in his opinion that, "[a]s Dr. McKenna also noted, Exhibit 12F page 3 (after the date last insured) notes the claimant was doing extremely well." R. 16, citing R. 279. However, the note does not say that Mr. DeMarco was doing extremely well. The note referenced, from Dr. Blas, actually says that Mr. DeMarco was experiencing pain which was still moderate, and was not being controlled by the use of M.S. Contin. *Id*. There is a note within the record which does state that Mr. DeMarco was doing "extremely well." R. 236. This treatment note by Dr. Boury was from December 15, 1997, several days after Mr. DeMarco's alleged date of injury and five years before Mr. DeMarco's date last insured. *Id*.

In this case, the mistake of fact is a harmless error. Though the ALJ misidentified the treatment note as occurring after the date last insured, it still occurred during the period in which Mr. DeMarco alleges that he was disabled. Furthermore, the ALJ noted additional reasons behind his determination that Mr. DeMarco was only partially credible. R. 16. Accordingly, because the credibility finding was not based wholly on a mistake of fact, and because a contrary finding would be deemed incredible in light of the ALJ's other enumerated reasons behind his determination of credibility, the mistake of fact was harmless, and does not require the case to be remanded.

### b. Credibility Determination

Mr. DeMarco also argues that the ALJ incorrectly relied upon limited activities when making his credibility determination. "Absent an error of law, [the court] may only reject the ALJ's credibility determination if it is not supported by substantial evidence." *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 1999).

The ALJ found Mr. DeMarco partially credible, stating that "the record does not support the extent of pain and limitations alleged by the claimant." R. 16. The ALJ then notes Mr. DeMarco's use of exercise and working in his garage repairing lawn mower engines for a half hour to one and a half hours per day in July 2000. *Id*. He also notes Mr. DeMarco's brief time

plowing snow in the Spring of 2002, as well as Mr. DeMarco's continued work repairing engines in his garage. *Id*. Mr. DeMarco argues that this is not sufficient reasoning for finding him partially credible as it leaves out details from Mr. DeMarco's testimony regarding his levels of pain, as well as limitations, which he would have to place on himself while working in his garage for his engine repair business and while plowing snow.

The ALJ does, however, take note of Mr. DeMarco's complaints of pain, as well as the testimony of Dr. McKenna regarding Mr. DeMarco's complaints of pain. R. 10-16. The ALJ noted that Dr. McKenna testified that he "did not understand why [Mr. DeMarco] has pain[,]" and that the "medical evidence did not show how [Mr. DeMarco] went from successful decompression surgery to [his] allegations of pain and limitation." R. 15. Furthermore, the ALJ noted that there was a four year gap in Mr. DeMarco's treatment between June of 1998 and March of 2002. R. 13. The only treatment Mr. DeMarco received during this time was a State Agency consultative examination on September 1, 2000. *Id*. The ALJ also noted that in December of 2002, Mr. DeMarco's pain was being controlled with MS Contin. R. 14.

Because the ALJ's credibility determination was founded upon substantial evidence, and he made a logical bridge from the

evidence to his conclusion, his finding regarding Mr. DeMarco's credibility is not be overturned on review.

### 3.    Reversal for an Award of Benefits

Mr. DeMarco argues that a reversal of the case with instruction to award benefits is the appropriate course of action for this Court to take.  An award of benefits may be instructed when "the record can yield but one supportable conclusion.  *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993).  "[A]n award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability.  *Briscoe v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005).

In this case, the record does not yield one supportable conclusion of disability.  Rather, the record indicates that the decision of the ALJ denying benefits was supported by substantial evidence and the case should not be remanded. Accordingly, the case will not be remanded with instruction to award benefits.

## VI.  CONCLUSION

For the reasons set forth above, the Court finds that the Commissioner did not err in denying an award of benefits to Mr. DeMarco. The Court denies Mr. DeMarco's motion for summary judgment.


DATE: September 20, 2013          ENTER:


_____
ARLANDER KEYS
United States Magistrate Judge